**FILED**

OCT - 1 2015

**Clerk, U.S. District and Bankruptcy Courts**

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA and the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, UTAH, VIRGINIA, WASHINGTON, and the DISTRICT OF COLUMBIA *ex rel.* ANDREW CAPP, <br><br> Plaintiffs, <br><br> v. <br><br> BAXTER INTERNATIONAL, INC., a Delaware corporation; and <br><br> BAXTER HEALTHCARE CORPORTION, a Delaware corporation, <br><br> Defendants. | Case No.: <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> JURY TRIAL DEMANDED <br><br> ***DO NOT PLACE IN PRESS BOX OR ENTER ON PUBLICLY ACCESSIBLE SYSTEM*** <br><br> Case: 1:15-cv-01602  Jury Demand <br> Assigned To : Sullivan, Emmet G. <br> Assign. Date : 10/1/2015 <br> Description: General Civil  (E Deck) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.      Relator Andrew Capp ("Relator") brings this action on behalf of the United States of America, the states of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Utah, Virginia, Washington, and the District of Columbia against Defendants BAXTER INTERNATIONAL, INC. and BAXTER HEALTHCARE CORPORATION for treble damages, restitution, and civil penalties for their violations of the

**RECEIVED**

OCT - 1 2015

Clerk, U.S. District & Bankruptcy Courts for the District of Columbia

False Claims Act, 31 U.S.C. § 3729 *et seq.* and the various false claims, Medicaid fraud, and taxpayer fraud prevention acts of the identified states and the District of Columbia.

2.      This action arises out of Defendants' systematic promotion of certain healthcare products for uses not approved as safe and effective by the Food and Drug Administration ("FDA") and Defendants' payment of kickbacks in the form of free or discounted equipment to hospitals, medical centers, surgeons and other health care providers to promote use of their products, all resulting in the submission of false claims to federal health care programs and state Medicaid programs.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.  The Court has supplemental jurisdiction over the counts related to state statutes pursuant to 28 U.S.C. § 1367.

4.      This Court has personal jurisdiction over Defendants pursuant to D.C. Code § 13-423 and/or D.C. Code § 13-334 because Defendants have transacted business in the District of Columbia and the claims for relief in this case arise, at least in part, from such transactions and because Defendants have had sufficiently systematic and continuous contacts with the District that they are doing business therein.

5.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because some of the acts proscribed by 31 U.S.C. § 3729 and complained of herein took place in the District and Defendants have transacted business in this District.

## PARTIES

6.      Defendant BAXTER INTERNATIONAL, INC. is a corporation organized under the laws of the State of Delaware with its corporate headquarters located in Deerfield, Illinois

and offices located throughout the country and the world.  Through its various subsidiaries, BAXTER INTERNATIONAL, INC. develops, manufactures, and markets healthcare devices and products, including pharmaceuticals, throughout the United States and the world.

7.      Defendant BAXTER HEALTHCARE CORPORATION is a corporation organized under the laws of the State of Delaware with its headquarters located in Deerfield, Illinois and offices located through the country and the world.  It is a subsidiary of Defendant BAXTER INTERNATIONAL, INC. focused on, among other things, the development, manufacture, and marketing of healthcare equipment and instruments.

8.      Relator Andrew Capp is a natural person, residing in the State of Florida.  Relator was employed as a sales representative by Synovis Life Technologies, Inc. from October 2007 until that company's acquisition by Defendant BAXTER INTERNATIONAL, INC. on or about February 2012, after which time he was employed by Defendants in a similar capacity (specifically, as a Territory Business Manager) until December 2012.  Relator was responsible for marketing Defendants' products to surgeons and surgery centers in Central and North Florida and, during certain periods, southern Alabama and Georgia.

9.      Relator has direct and independent knowledge of the false statements and claims that Defendants caused to be submitted to the Government.

## LEGAL AND REGULATORY BACKGROUND

### Governmental Health Care Programs

10.     The federal, state and local governments, through their Medicaid, Medicare, Tricare, Veteran's Administration and other government healthcare programs, are among the principal purchasers of Defendants' products.

11.     Plaintiff the United States of America, acting through the Department of Health and Human Services, administers Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid") and the Health Insurance for the Aged and Disabled Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*. ("Medicare").

12.     Medicare is a federal government health program primarily benefiting the elderly that Congress created in 1965 when it adopted Title XVIII of the Social Security Act.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

13.     Congress created Medicaid at the same time it created Medicare in 1965 when Title XIX was added to the Social Security Act.  Medicaid is a public assistance program providing payment of medical expenses for low-income patients.  Funding for Medicaid is shared between the federal and state governments.  The federal government also separately matches certain state expenses incurred in administering the Medicaid program.  While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage.

14.     Tricare is the health care system of the United States military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active

duty personnel and career military retirees and their dependents.  The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers.  Tricare is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations and fee-for-service benefits.  Managed care support contractors create networks of civilian health care providers.

15.     Whereas Tricare treats active duty military and their dependents, the Veterans Administration ("VA") provides health care and other benefits to veterans of the military through its nationwide network of hospitals and clinics.

16.     The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans managed by the Office of Personnel Management.

### The False Claims Act

17.     The False Claims Act provides, in pertinent part, that any person who:

(a)(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or

(a)(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.[1]  For purposes of the False Claims Act,

the terms "knowing" and "knowingly" –

(A)   mean that a person, with respect to information –

(i)   has actual knowledge of the information;

(ii)   acts in deliberate ignorance of the truth or falsity of the information; or

(iii)   acts in reckless disregard of the truth or falsity of the information; and

(B)   require no proof of specific intent to defraud;

31 U.S.C. § 3729(b)(1).  The states made party to this action have enacted false claims or similar statutes that apply to Medicaid fraud and/or fraudulent health care claims submitted for payment by government funds.

18.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

**The Anti-Kickback Statute**

19.    The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration given to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its

---

[1] To the extent the conduct alleged herein occurred prior to March 23, 2010, the prior versions of the False Claims Act are applicable (*i.e.*, 31 U.S.C. § 3730(e), as amended, October 27, 1986 and May 20, 2009).

reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42

U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142;

Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

20.     The Anti-Kickback Statute prohibits any person or entity from knowingly and

willfully offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or

indirectly, to induce or reward any person for purchasing, ordering, or recommending or

arranging for the purchasing or ordering of federally-reimbursable medical goods or services:

> [W]hoever knowingly and willfully offers or pays any remuneration (including
> any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash
> or in kind to any person to induce such person—
>
> > (A) to refer an individual to a person for the furnishing or arranging for the
> > furnishing of any item or service for which payment may be made in whole
> > or in part under a Federal health care program, or
> >
> > (B) to purchase, lease, order, or arrange for or recommend purchasing,
> > leasing, or ordering any good, facility, service, or item for which payment
> > may be made in whole or in part under a Federal health care program, shall
> > be guilty of a felony and upon conviction thereof, shall be fined not more
> > than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2).

21.     The term "remuneration" is defined to include "transfers of items or

services for free or for other than fair market value".  42 U.S.C. § 1320a-7a(i)(6).

22.     Because compliance with the Anti-Kickback Statute is a condition of

payment, claims submitted for services rendered in violation of these statutes may be

"false or fraudulent" for purposes of the FCA.

23.     Violation of the statute also can subject the perpetrator to exclusion from

participation in federal health care programs and, effective August 6, 1997, civil

monetary penalties of $50,000 per violation and three times the amount of remuneration

paid.  42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

24.     The Patient Protection and Affordable Care Act, Public Law No. 111-148, Sec. 6402(f), amended the Anti-Kickback Statute to specifically provide that claims which include items or services resulting from a violation of the Anti-Kickback Statute constitute a false or fraudulent claim for purposes of the False Claims Act.  42 U.S.C. § 1320a-7b(g).

25.     The Patient Protection and Affordable Care Act further amended the Anti-Kickback Statute so as to make clear that "a person need not have actual knowledge of [the Statute] or specific intent to commit a violation" in order to violate the Anti-Kickback Statute.  42 U.S.C. § 1320a-7b(f).

## DEFENDANTS' CONDUCT

26.     This action arises from Defendants' marketing and sale of their core group of products used in various surgical operations, including Veritas® Collagen Matrix, TISSEEL and ARTISS.   As detailed below, Defendants have engaged in off-label marketing of Veritas® Collagen Matrix and TISSEEL and they have violated the Anti-Kickback Statute by offering free equipment and devices to physicians and medical centers in exchange for their purchase of specified quantities of Defendants' core products.

27.     Defendants have violated the Acts by, among other things, marketing their products for off-label uses, *i.e.*, uses not approved by the FDA, knowing that the products would be purchased and used by doctors and medical facilities providing services reimbursed and/or paid for by government healthcare programs.

28.     Moreover, Defendants knew that these products would be used for such off-label uses during reimbursable operations which would in turn expose patients to unapproved uses of

their products and increase materials costs and overhead, potentially causing doctors and facilities to request higher reimbursements from government healthcare programs.

29.     Defendants have further violated the Acts by providing or causing to be provided inducements and kickbacks to physicians and medical centers providing reimbursable medical services pursuant to various government programs.

30.     From at least 2007 through the present, Defendants have conspired with each other, their respective employees, and various physicians and medical centers to defraud the United States and the states by submitting or causing to be submitted false or fraudulent claims for payment by governments and by creating and implementing kick-back programs.

## Off-Label Marketing

31.     The Federal Food, Drug, and Cosmetic Act ("FDCA") protects the health and safety of the public by ensuring, among other things, that medical products intended for use in humans are safe and effective for their intended uses and that their labeling bears true, complete and accurate information.

32.     The FDA has the authority to approve the marketing of a drug or other medical product only for uses that the FDA has found to be both safe and efficacious through clinical trials or otherwise.   21 U.S.C. § 355(d).   Manufacturers are prohibited from marketing or promoting products for non-FDA-approved indications.   21 U.S.C. § 331; 21 C.F.R. § 312.7.

33.     Accordingly, under the FDCA, a company must specify the intended uses for a drug, biologic, device, or other product in an application to the FDA for approval.   Once the product is approved for the indication(s) so-specified, if the company intends a different use and then introduces the product into interstate commerce for a new or unapproved use, the drug

becomes misbranded.  This unapproved use is known as an "off-label" use because it is not included in the product's FDA-approved labeling.

34.     Medicare specifically excludes from coverage any expenses incurred for products or services that are not "reasonable and necessary" under the circumstances.   42 U.S.C. § 1395y(a); 42 C.F.R. § 411.15(k); Medicare Benefit Policy Manual, Pub. 100-02, Ch. 16 § 20.

35.     To be "reasonable and necessary," Medicare must first find that the use of a specific drug, device, or biological product is "safe and effective."  Medicare considers use of a drug, device, or biological product to be "safe and effective" when the use is within the scope of the indications specified on the FDA-approved label.  Medicare Benefit Policy Manual, Pub. 100-02, Ch. 15 § 50.4.1.

36.     Medicaid similarly excludes from coverage uses of a drug, device, or biological product "for a medical indication which is not a medically accepted indication," 42 U.S.C. § 1396r-8(k)(3), which in turn is defined as a use "approved under the Federal Food, Drug and Cosmetic Act ...."  42 U.S.C. § 1396r-8(k)(6).  Many state Medicaid programs have similar, or more stringent, limitations on coverage of off-label uses of drugs, devices, or biological products.

37.     FEHBP plans cover the use of a drug, device, or biological product only if reasonable and necessary and/or safe and effective or medically accepted as used.

38.     The VA covers use of a drug, device, or biological product only if it has been medically determined to be reasonable and necessary for the patient.  38 U.S.C. § 1722A; 38 C.F.R. §§ 17.30 & 17.38.

39.     CHAMPUS covers an off-label use of a drug, device, or biological product only when it is determined to be medically necessary according to accepted standards of medical practice.  32 C.F.R. 199.4(e)(5)(A)(v).

40.     TRICARE covers the cost of a drug, device, or biological product only when used "for its labeled indication" unless TRICARE conducts a review and determines based on reliable evidence that the use is both medically necessary and "safe, effective, and in accordance with nationally accepted standards of practice in the medical community."  TRICARE Policy Manual 6010.57-M, Ch. 8, § 9.1, ¶ 2.2.4 & ¶ 2.2.5.

### Veritas® Collagen Matrix

41.     Veritas® Collagen Matrix is an implanted biological mesh comprised of non-crosslinked bovine pericardium (*i.e.*, cow heart membrane).  It is regulated by the FDA as a Class II medical device and is indicated for use in the surgical reconstruction of the pelvic floor, for use in the repair of rectal prolapse, and for use as an implant for the surgical repair of soft tissue deficiencies (specifically abdominal and thoracic wall repair, muscle flap reinforcement, and repair of hernias).

42.     Since at least 2007, Defendants (including through their predecessor in interest, Synovis Life Technologies, Inc.) actively and aggressively marketed Veritas® Collagen Matrix for off-label uses.  Specifically, Defendants promoted Veritas® Collagen Matrix for use in a *primary* colostomy procedure even though it is indicated only for *repair* of a paracolostomy hernia or other defect (*i.e.*, a secondary procedure).

43.     Colostomy is a surgical procedure that brings one end of the large intestine out through an opening (a stoma) made in the abdominal wall.  Stool moving through the intestine then drains through the stoma into a bag attached to the abdomen.  A colostomy can be either

temporary or permanent and may be necessary for a number of reasons, including an infection of the abdomen such as diverticulitis, an injury to the colon or rectum (such as a puncture or gunshot wound), an intestinal obstruction, or rectal or colon cancer.

44.     In excess of 100,000 stoma surgical procedures are performed each year.  The average age of persons having a colostomy has been estimated at 70.6 years and the average age of persons having an ostomy of any type has been estimated at 68.3 years.  The average ostomy patient, therefore, is likely to be a Medicare beneficiary.

45.     Veritas® Collagen Matrix is not indicated for use in a colostomy procedure for preventative care or as a prophylactic measure.  It is, however, indicated for the repair of a paracolostomy hernia, a frequent complication following the construction of a colostomy.

46.     Defendants, however, instructed and encouraged sales personnel to promote Veritas® Collagen Matrix for off-label use as a prophylactic measure in connection with primary colostomy procedures.

47.     Specifically, Defendants published and provided to sales personnel marketing materials that referenced the potential use of Veritas® Collagen Matrix specifically or biological mesh generally as a prophylactic tool in abdominal procedures, including citations to articles proposing or evaluating such uses of the product.

48.     In 2011, Synovis called an impromptu meeting of sales personnel.  At that meeting, company executives instructed employees on a new sales strategy built specifically around promoting the expanded use of Veritas® Collagen Matrix to *prevent* (not just repair) parastomal hernias.

49.     At this meeting, Synovis Vice President of Sales and Marketing Jodi Brendel specifically implored sales personnel to promote the use of Veritas® Collagen Matrix for

primary colostomy procedures, articulating exactly the strategy of prompting doctors to make the deduction that "if it works for one, then it must work for the other …." Ms. Brendel contended that expanding sales efforts in this fashion could lead to 20-25% growth in sales of Veritas® Collagen Matrix.

50.     Synovis implemented and directed this strategy by having sales representatives engage in role playing activities in which the sales employees would practice suggesting to physicians how Veritas® Collagen Matrix could be used to reinforce a stoma at the time it was created and thus prevent a hernia or other complication before it occurred.

51.     As a further part of this sales strategy, Synovis executives and representatives actively cultivated prominent physicians and medical experts whom they referred to as Key Opinion Leaders ("KOLs"). Synovis sought to educate KOLs about the potential preventative use of Veritas® Collagen Matrix and to encourage them to investigate and further publicize and promote the practice.

52.     Synovis arranged for one physician, Dr. Stephen M. Cohen, to speak to the sales personnel about the prophylactic utilization of Veritas® Collagen Matrix.

53.     Later in 2011, executives directed Relator and other sales personnel to destroy the written materials that had been distributed in furtherance of this strategy.

54.     Shortly thereafter, however, Synovis instituted a new sales incentive program entitled "Drive to 75." The "75" referred to $75 million, the annual sales target Synovis implored its sales representatives to achieve—a figure that reflected the same 20-25% growth in sales targeted by the earlier, explicit off-label marketing campaign.

55.     The "Drive to 75" incentive program was different from and more generous than previous incentive offerings.  The sales representative who ranked highest under a points system was promised a fully-paid lease on a new Porsche.

56.     Although the explicit written materials had been pulled back, the clear understanding communicated by Synovis to its sales teams was that the growth objective remained the same and that sales representatives should use the same sales strategy emphasizing off-label use of Veritas® Collagen Matrix to achieve that objective.

**TISSEEL**

57.     TISSEEL is a fibrin sealant.  It is regulated by the FDA as a biological product approved through a biologics license application ("BLA").  As approved by the FDA, TISSEEL is indicated for use as an adjunct (1) to standard surgical techniques (such as suture and ligature) to prevent leakage from colonic anastomoses following the reversal of temporary colostomies and (2) to hemostasis in patients undergoing surgery when control of bleeding by conventional surgical techniques are ineffective or impractical.

58.     The FDA-approved indication for TISSEEL authorizes its use as an adjunct to standard surgical techniques (such as suture and ligature) to prevent leakage from colonic anastomoses *following the reversal of temporary colostomies* (*i.e.*, a *revised* or second anastomosis).  It is not, however, indicated for use in the primary anastomosis or the initial construction of the colostomy.

59.     Since at least 2012, however, Defendants have actively and aggressively marketed TISSEEL for uses other than those approved by the FDA.  Specifically, Defendants have promoted TISSEEL for use in a *primary* (first) anastomosis even though the FDA-approved indication is only for *secondary* amastomoses.

60.     Primary anastomosis is a surgical procedure by which two sections of an organ are reconnected following the removal of diseased or damaged tissue.  The procedure is most frequently used in bowel surgery following a colectomy (a procedure by which inflamed, cancerous, or otherwise pathological tissue is removed from the large intestine).

61.     Temporary stomas can be formed to allow the bowel to heal following primary anastomosis, but a second operation is required to reverse this.  The reversal operation involves re-joining the ends of the bowel and closing the stoma that had been previously created.  The FDA-approved indication for TISSEEL only authorizes its use in this type of secondary colonic anastomosis.

62.     Defendants nonetheless promoted TISSEEL for use to prevent or alleviate bleeding in a primary anastomosis.  Specifically, Defendants instructed and encouraged sales personnel to emphasize the general hemostatic (*i.e.*, blood flow arresting) capabilities of TISSEEL in their conversations with physicians, communicating implicitly (or explicitly, if necessary) that if the product worked for the indicated revised (second) anastomosis then it also would work for the primary anastomosis.

63.     Defendants organized efforts to educate sales personnel on research and publications relating to uses of TISSEEL other than those for which it was indicated, including distributing publications, explaining them, and even arranging for doctors and researchers to give presentations and talks specifically geared towards sales personnel.

64.     Defendants also provided sales personnel with professional reprints of articles from medical journals which pertained to the use of TISSEEL specifically or fibrin sealants generally in procedures other than those covered by the FDA-approved indications.  Defendants

instructed and encouraged sales personnel to distribute these publications and to discuss them with physicians.

65.     During March 2012 meetings with sales personnel in connection with the integration of Baxter and Synovis, a Vice President of Sales specifically encouraged sales personnel to promote the use of TISSEEL for primary anastomosis

66.     In addition, Defendants even went so far as to provide express instructions for off-label uses of TISSEEL.  Specifically, Defendants provided physicians, medical centers, and their staffs with recipes or instructions for diluting TISSEEL for use in plastic surgery cases and ophthalmic procedures.[2]

## Unlawful Kickbacks

67.     Defendants also created several programs in order to induce or otherwise coerce medical facilities to purchase certain products in inflated or excessive amounts in exchange for kickbacks in the form of free or discounted equipment and devices.

### The Baxter Spray Device Program

68.     TISSEEL and ARTISS are produced in a pre-filled, pre-mixed syringe.  During surgery, they are applied topically which requires the use of a spray device that mixes the drug substance with carbon dioxide to disperse the product.

69.     Defendants manufacture and sell pressure regulator devices with which their fibrin sealants, TISSEEL and ARTISS, can be administered.  Specifically, the DuploSpray

---

[2] Defendants ultimately introduced ARTISS, a less concentrated version of the same drug substance as TISSEEL indicated for use as a fibrin sealant in certain plastic surgery procedures, specifically (1) to adhere autologous skin grafts to surgically prepared wound beds resulting from burns in adult and pediatric populations of a year old or more; and (2) to adhere tissue flaps during facial rhytidectomy surgery (*i.e.*, a face-lift).  Before ARTISS was approved by the FDA, however, Defendants promoted the use of TISSEEL for these indications and continued to do so even after ARTISS was approved.

Regulator (Baxter product code #0600032) is designed for use with TISSEEL in laparoscopic surgical procedures and the EasySpray Pressure Regulator (Baxter product code #0600012) is designed for use with either TISSEEL or ARTISS in an open surgical procedure.  Baxter also produces a DuploSpray MIS Roll Stand (Baxter product code #0600040) for use with the DuploSpray Regulator.

70.     These devices can be reused in surgery after surgery.  A device of this nature, however, is necessary for the administration of both TISSEEL and ARTISS per the instructions for use ("IFU").

71.     Defendants make the DuploSpray Regulator and the EasySpray Pressure Regulator available for purchase at a price of approximately $700 to $750 each.

72.     However, Defendants developed a promotional program for TISSEEL and ARTISS whereby they gave medical providers one or more of these devices free of charge if the providers purchased a specified amount of either TISSEEL or ARTISS.

73.     Because Defendants provided these devices without charge to induce the purchase of different goods (*i.e.*, TISSEEL and ARTISS) and the devices are not reimbursed by Medicare or Medicaid using the same methodology (if at all), these transactions do not qualify as "discounts" under the discount safe harbor provision.  42 C.F.R. § 1001.952(h)(5).

74.     Further, the mechanics by which the devices were transferred to providers also operate to make the gifting of the devices ineligible for the discount safe harbor provision even if they qualified as "discounts" within the meaning of that provision.

75.     Specifically, Defendants had medical providers enter into a "BioSurgery purchasing agreement" pursuant to which the providers agreed to purchase a required amount of TISSEEL or ARTISS.

76.     Separately, Defendants had the providers enter into a Baxter Spray Device Evaluation Agreement.   (Exhibit A hereto.)   This Evaluation Agreement provided that Defendants would deliver and install the device(s) indicated and provide in-service training regarding the use of the devices.  The customer then would "possess" the device "for up to (60) days from date of delivery (the 'Evaluation Period') at no rental fee, for the sole purpose of evaluating the Device for all currently approved indications to determine whether Customer wants to purchase such Devices from Baxter."  (Exh. A ¶ 3.)

77.     At the end of the Evaluation Period, so long as "Customer has met or elects to meet its disposable purchase requirements for obtaining a spray device as set forth in customer's BioSurgery purchasing agreement, Customer will take ownership of the Device and Baxter will provide additional in-service training as needed upon request."  (Exh. A ¶ 7.)

78.     If, however, the customer does not meet the "disposable purchase requirements," it is required to return the device(s) to Defendants and if the customer fails to do so within 20 days after the end of the Evaluation Period Defendants will invoice the customer for "the fair market value for the Device, subject to Baxter's standard terms and conditions."  (Exh. A ¶ 7.)

79.     Accordingly, under Defendants' program they would issue an invoice for the devices only to customers who *do not* meet the purchase requirements and, therefore, are actually paying market price for the devices.  Under the scenario where the customer purchases the required amount of TISSEEL or ARTISS, Defendants never invoice the customer for the devices (even at $0.00)—ownership of the devices simply transfers to the customer.

80.     To fit within the "discount" safe harbor provision, a seller providing a discount to an entity that reports its costs on a Medicare or Medicaid cost report "must fully and accurately report such discount *on the invoice, coupon or statement submitted to the buyer*; inform the

buyer in a manner that is reasonably calculated to give notice to the buyer of its obligations to report such discount and to provide information upon request …; and refrain from doing anything that would impede the buyer from meeting its obligations ….”   42 C.F.R. § 1001.952(h)(2)(ii)(A) (emphasis added).

81.     Defendants' Evaluation Agreement does note that "any discounts or other reductions in price" may be considered as such under the Anti-Kickback Statute and states that "Customer shall fully and accurately disclose such discounts and other reductions in price in accordance with the applicable state or federal cost reporting requirements" (Exh. A ¶ 8), but this is insufficient to comply with all of the requirements of regulation.

82.     Even outside the formal program, Defendants regularly provided customers with free DuploSpray Regulators and EasySpray Pressure Regulators.  If a provider requested new or additional devices or a sales representative perceived a need or opening to be helpful, the representative could simply call in a request and Defendants would send the requested or volunteered devices with a no-charge purchase order.

**Freezer Discount Program**

83.     Defendants further knowingly devised a promotional program for their ARTISS and TISSEEL products whereby they offered medical facilities discounts of up to 100% on storage freezers valued at $1,224.00.

84.     ARTISS and TISSEEL both must be stored at a temperature no higher than minus 20° Celsius.

85.     To induce the purchase of ARTISS and TISSEEL, Defendants offered customers Sanyo Undercounter Laboratory Refrigeration units free or at discounted prices.

86.     Under the program, if a customer either (1) placed an order for $10,000 or more of ARTISS or TISSEEL to ship immediately or (2) created an open purchase order ("Open PO") for such an amount to deliver over a six-month period, the customer also could place an order for a freezer which would be invoiced at $0.00 reflecting a discount of $1,224.00.

87.     Even without placing a $10,000 order, a customer could still order a freezer which Baxter would invoice for just $909.84.

88.     Because Defendants provided these freezers without charge to induce the purchase of different goods (*i.e.*, TISSEEL and ARTISS) and the devices are not reimbursed by Medicare or Medicaid using the same methodology (if at all), these transactions do not qualify as "discounts" under the discount safe harbor provision.  42 C.F.R. § 1001.952(h)(5).

89.     Further, while the amount of the discount ($1,224.00) was disclosed on an invoice to the customer under the scenario where the customer purchased $10,000 of ARTISS or TISSEEL, the discount for customers not meeting the $10,000 threshold was not fully disclosed on the invoice.  Instead, such customers were invoiced for $909.84 with no discount shown.

90.     Accordingly, even if they qualified as "discounts" within the meaning of the discount safe harbor provision, the discounts provided by Defendant to this category of customers was not disclosed as required by the regulation.

91.     Further, neither the Freezer Discount Program Request Forms nor the materials provided to customers about the program contained any disclosure regarding potential implications under the Anti-Kickback Statute or the need to fully disclose the discount to Medicare and/or Medicaid.

92.     Even outside the formal Freezer Discount Program, Defendants provided incentives to customers by replacing TISSEEL and ARTISS product free of charge.  Even if a

provider did not have appropriate freezer units or had insufficient freezer space, TISSEEL or ARTISS shipped by Defendants would still be good for approximately four days even without proper freezer storage. If, however, some or all of the product was not used within the four days, Defendants replaced the product free of charge.

### Biosurgery Procedure Cart Program

93.     Defendants further knowingly developed a promotional program whereby medical facilities who purchased a minimum amount of one of their "Core Products" would receive a cart valued at $495. This cart was emblazoned with Defendants' name, product names and slogans. This cart was specially designed to be used with Defendants' products and to remind patients, medical providers and sales agents from competing medical suppliers that Defendants and their products were entrenched at the facility.

94.     Specifically, if a customer ordered $6,000 or more of any one of Defendants' core products (identified as TISSEEL, ARTISS, COSEAL Surgical Sealant, FLOSEAL Hemostatic Matrix, GELFOAM PLUS Hemostasis Kit, and ADEPT Adhesion Reduction Solution) they could also select to receive a biosurgery procedure cart.

95.     Because Defendants provided these carts without charge to induce the purchase of different goods (*i.e.*, their various "Core Products") and the devices are not reimbursed by Medicare or Medicaid using the same methodology (if at all), these transactions do not qualify as "discounts" under the discount safe harbor provision. 42 C.F.R. § 1001.952(h)(5).

96.     Further, neither the Biosurgery Procedure Cart Request Form nor the materials provided to customers about the program contained any disclosure regarding potential implications under the Anti-Kickback Statute or the need to fully disclose the discount to Medicare and/or Medicaid.

\* \* \* \* \*

97.     Defendants, therefore, transferred the above-described equipment or devices to numerous hospitals, medical centers, and physicians for free or for other than fair market value to induce such persons or entities to purchase or order their products in violation of the Anti-Kickback Statute.

98.     All of the above-described equipment (*i.e.*, the DuploSpray Regulator, the EasySpray Pressure Regulator, the freezer, and the cart) constitute *non-reimbursable* equipment. These items all constitute equipment for which neither Medicare nor Medicaid will reimburse a provider, much less reimburse using the same methodology as Medicare and/or Medicaid will reimburse for products such as TISSEEL and ARTISS.

99.     Accordingly, the free equipment provided by Defendants does not qualify for the safe harbor regulation for "discounts" because those regulations specifically exclude the scenario of "[s]upplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service, *unless* the goods and services are reimbursed by the same Federal health care program using the same methodology *and* the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology".  42 C.F.R. § 1001.952(h)(5) (emphasis supplied).

100.     Further, because Defendants provided the devices and equipment free of charge to facilities that purchased sufficient quantities of consumable product, such facilities had an incentive to order and use excessive quantities of complementary consumable product.

101.     Defendants continue to train, encourage, and promote, both overtly and covertly, the programs associated with the products that include free equipment when a certain amount of product is ordered.

102.    Defendants' actions violated the Anti-Kickback Act, 42 U.S.C. § 1320a-7b, and resulted in the increased sale of certain products through inducement and coercion of product purchases bundled with gratuitous medical equipment and/or products.

103.    Defendants' conduct has been ongoing for many years, and in some instances started as early as 2005.

104.    As a result of Defendants' fraudulent acts, Defendants wrongfully caused the submission of millions of dollars of false or fraudulent claims.

105.    Furthermore, as a result of Defendants' acts in violation of the above referenced statutes, the Government has incurred and continues to incur damages.

**COUNT ONE**
**Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

106.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

107.    From 2005 through the present, Defendants unlawfully promoted the purchase and use of their products for indications other than those approved by the FDA.

108.    From at least 2012 to the present, Defendants offered and provided kickbacks to physicians and medical facilities in the form of free medical equipment and devices to induce them to purchase, order, or recommend or arrange for the purchasing or ordering of Defendants' products in violation of 42 U.S.C. § 1320a-7b(b)(2).  As a result, all of the claims Defendants caused those physicians and medical centers to present to Medicare or Medicaid for those products are false or fraudulent.

109.    Accordingly, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

110. By virtue of the false or fraudulent claims Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT TWO
### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

111. The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

112. From 2005 through the present, Defendants unlawfully promoted the purchase and use of their products for indications other than those approved by the FDA.

113. From at least 2012 to the present, Defendants offered and provided kickbacks to physicians and medical facilities in the form of free medical equipment and devices to induce them to purchase, order, or recommend or arrange for the purchasing or ordering of Defendants' products in violation of 42 U.S.C. § 1320a-7b(b)(2).

114. As a result, Defendants caused those physicians and medical centers to submit statements and reports to the Government which inflated the cost of the reimbursable consumable products and/or included within costs for which they sought reimbursement non-covered equipment costs.

115. Defendants further caused said physicians and medical centers to make or use false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).

116. Accordingly, Defendants knowingly caused to be made or used false records or statements material to false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(B).

117.    By virtue of the false records or statements Defendants caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT THREE
### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

118.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

119.    From 2005 through the present, Defendants conspired with each other and their employees to unlawfully promote the purchase and use of their products for indications other than those approved by the FDA.

120.    From at least 2012 to the present, Defendants further conspired with each other, their employees, and various physicians and medical centers to offer and provide kickbacks to physicians and medical facilities in the form of free medical equipment and devices to induce them to purchase, order, or recommend or arrange for the purchasing or ordering of Defendants' products in violation of 42 U.S.C. § 1320a-7b(b)(2).

121.    By their conduct, all of the claims Defendants caused those physicians and medical centers to present to Medicare or Medicaid for those products are false or fraudulent, Defendants caused those physicians and medical centers to submit statements and reports to the Government which inflated the cost of the reimbursable consumable products and/or included within costs for which they sought reimbursement non-covered equipment costs, and Defendants further caused said physicians and medical centers to make or use false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)..

122.    Accordingly, Defendants conspired to defraud the United States by getting false or fraudulent claims allowed or paid and/or by causing to be made or used false records or statements material to false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(C).

123.    By virtue of the false or fraudulent claims Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT FOUR
## Violation of California False Claims Act

124.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

125.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12651 *et seq.*

126.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the California Medicaid Program (*i.e.*, Medi-Cal) false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

127.    The California Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

128.    By reason of these payments, the California Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT FIVE
### Violation of Colorado Medicaid False Claims Act

129.   The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

130.   This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, *et seq.*

131.   By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Colorado Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

132.   The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

133.   By reason of these payments, the Colorado Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT SIX
### Violation of Connecticut False Claims Act

134.   The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

135.   This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 *et seq.*

136.   By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Connecticut Medicaid Program false or fraudulent claims for payment or approval and/or

knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

137.    The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

138.    By reason of these payments, the Connecticut Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT SEVEN**
**Violation of Delaware False Claims Act**

139.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

140.    This is a claim for treble damages and civil penalties under the Delaware False Claims Act, Del. Code Ann. Tit. 6, § 1201 *et seq.*

141.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Delaware Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

142.    The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

143.    By reason of these payments, the Delaware Medicaid Program has been damaged and continues to be damaged in a substantial amount.

### COUNT EIGHT
### Violation of Florida False Claims Act

144.     The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

145.     This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*.

146.     By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

147.     The Florida Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

148.     By reason of these payments, the Florida Medicaid Program has been damaged and continues to be damaged in a substantial amount.

### COUNT NINE
### Violation of Georgia False Medicaid Claims Act

149.     The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

150.     This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*.

151.     By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval and/or

knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

152.    The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

153.    By reason of these payments, the Georgia Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT TEN**
**Violation of Hawaii False Claims Act**

154.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

155.    This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq.*

156.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Hawaii Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

157.    The Hawaii Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

158.    By reason of these payments, the Hawaii Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT ELEVEN
### Illinois Whistleblower Reward and Protection Act

159.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

160.    This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat 175/1 *et seq.*

161.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

162.    The Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

163.    By reason of these payments, the Illinois Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWELVE
### Violation of Indiana False Claims and Whistleblower Protection Act

164.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

165.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

166.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Indiana Medicaid Program false or fraudulent claims for payment or approval and/or

knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

167.    The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

168.    By reason of these payments, the Indiana Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT THIRTEEN**
**Violation of Iowa False Claims Act**

169.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

170.    This is a claim for treble damages and civil penalties under the Iowa False Claims Act, Iowa Code § 685.1 *et seq*.

171.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Iowa Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

172.    The Iowa Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

173.    By reason of these payments, the Iowa Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT FOURTEEN
### Violation of Louisiana Qui Tam Action Act and Louisiana Medical Assistance Programs Integrity Law

174.     The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

175.     This is a claim for treble damages and civil penalties under the Louisiana Quit Tam Action Act, La. Rev. Stat. Ann. § 46:438:3 *et seq.*, and the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 *et seq.*

176.     By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

177.     The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

178.     By reason of these payments, the Louisiana Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT FIFTEEN
### Violation of Maryland False Health Claims Act

179.     The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

180.     This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act, Md. Code Ann. § 2-601 *et seq.*

181.     By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to

the Maryland Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

182.    The Maryland Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

183.    By reason of these payments, the Maryland Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT SIXTEEN**
**Violation of Massachusetts False Claims Act**

184.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

185.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(O).

186.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

187.    The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

188.    By reason of these payments, the Massachusetts Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT SEVENTEEN**
**Violation of Michigan Medicaid False Claims Act**

189.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

190.    This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, MCLA § 400.601 *et seq.*

191.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

192.    The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

193.    By reason of these payments, the Michigan Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT EIGHTEEN**
**Violation of Minnesota False Claims Act**

194.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

195.    This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*

196.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Minnesota Medicaid Program false or fraudulent claims for payment or approval and/or

knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

197.    The Minnesota Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

198.    By reason of these payments, the Minnesota Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT NINETEEN
### Violation of Montana False Claims Act

199.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

200.    This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mon. Code Ann. § 17-8-401 *et seq*.

201.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Montana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

202.    The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

203.    By reason of these payments, the Montana Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY
### Violation of Nevada False Claims Act

204.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

205.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq*.

206.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Nevada Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

207.    The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

208.    By reason of these payments, the Nevada Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-ONE
### Violation of New Hampshire Medicaid Fraud and False Claims Law

209.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

210.    This is a claim for treble damages and civil penalties under the New Hampshire Medicaid Fraud and False Claims Law, N.H. Rev. Stat. Ann. § 167:61-b *et seq*.

211.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the New Hampshire Medicaid Program false or fraudulent claims for payment or approval and/or

knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

212.    The New Hampshire Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

213.    By reason of these payments, the New Hampshire Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT TWENTY-TWO**
**Violation of New Jersey False Claims Act**

214.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

215.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § C2A:32C-1-C2a:32C-17.

216.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

217.    The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

218.    By reason of these payments, the New Jersey Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-THREE
### Violation of New Mexico Medicaid False Claims Act

219.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

220.    This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. 1978 § 27-14-1 *et seq.*

221.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

222.    The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

223.    By reason of these payments, the New Mexico Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-FOUR
### Violation of New York False Claims Act

224.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

225.    This is a claim for treble damages and civil penalties under the New York New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*

226.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the New York Medicaid Program false or fraudulent claims for payment or approval and/or

knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

227.     The New York Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

228.     By reason of these payments, the New York Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT TWENTY-FIVE**
**Violation of North Carolina False Claims Act**

229.     The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

230.     This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*

231.     By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the North Carolina Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

232.     The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

233.     By reason of these payments, the North Carolina Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-SIX
### Violation of Oklahoma False Claims Act

234.     The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

235.     This is a claim for treble damages and civil penalties under the Oklahoma False Claims Act, 63 Okla. Stat. § 5053 *et seq*.

236.     By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

237.     The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

238.     By reason of these payments, the Oklahoma Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-SEVEN
### Violation of Rhode Island False Claims Act

239.     The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

240.     This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq*.

241.     By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval and/or

knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

242.    The Rhode Island Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

243.    By reason of these payments, the Rhode Island Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT TWENTY-EIGHT**
**Violation of Tennessee Medicaid False Claims Act and Tennessee False Claims Act**

244.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

245.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*, and the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 *et seq.*

246.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Tennessee Medicaid Program (*i.e.*, TennCare) false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

247.    The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

248.    By reason of these payments, the Tennessee Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-NINE
### Violation of Texas Medicaid Fraud Prevention Act

249.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

250.    This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

251.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

252.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

253.    By reason of these payments, the Texas Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT THIRTY
### Violation of Utah False Claims Act

254.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

255.    This is a claim for treble damages and civil penalties under the Utah False Claims Act, Utah Code Ann. § 26-20-1 *et seq.*

256.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Utah Medicaid Program false or fraudulent claims for payment or approval and/or knowingly

accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

257.    The Utah Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

258.    By reason of these payments, the Utah Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT THIRTY-ONE
### Violation of Virginia Fraud Against Taxpayers Act

259.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

260.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*.

261.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

262.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

263.    By reason of these payments, the Virginia Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT THIRTY-TWO
### Violation of Washington Medicaid Fraud False Claims Act

264.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

265.    This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et seq.*

266.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described above, Defendants knowingly presented or caused to be presented to the Washington Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

267.    The Washington Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

268.    By reason of these payments, the Washington Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT THIRTY-THREE
### Violation of District of Columbia False Claims Act

269.    The allegations of each of the preceding paragraphs are repeated and realleged here as if fully set forth herein.

270.    This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code § 2-308.14 *et seq.*

271.    By virtue of the off-label marketing, kickbacks, misrepresentations, submissions, and other conduct described District of Columbia Medicaid Program false or fraudulent claims

for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

272.    The District of Columbia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

273.    By reason of these payments, the District of Columbia Medicaid Program has been damaged and continues to be damaged in a substantial amount.

### DEMAND FOR RELIEF

WHEREFORE, Relator respectfully requests that this Court enter judgment against Defendants and order and rule that:

a.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*., and the State False Claims Acts;

b.    Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount to the States under similar provisions of the State False Claims Acts;

c.    Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

d.    Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

e.    Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f.      Defendants disgorge all sums by which they have been enriched unjustly by their

wrongful conduct; and

g.      The United States, the States, and Relator recover such other relief as the Court

deems just and proper.

### Demand for Jury Trial

Relator, on behalf of himself, the United States, the states of California, Colorado,

Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland,

Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New

Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Utah, Virginia,

Washington, and the District of Columbia respectfully demands a jury trial on all claims alleged

herein.

This 30th day of September, 2015.

Respectfully submitted,

Tillman J. Finley (DC Bar No. 477737)
MARINO FINLEY PLLC
1100 New York Avenue, NW  Suite 700W
Washington, DC  20005
Tel:  (202) 223-8888

Natalie Khawam
WHISTLEBLOWER LAW FIRM, PA
400 N. Tampa Street, Suite 950
Tampa, FL  33602
Tel:  (813) 944-7853

*Attorneys for Relator*

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2015, I caused to be served a copy of the foregoing via certified mail, return receipt requested:

Attorney General of the United States
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC  20530-0001

The Attorney General's Office
California Department of Justice
Attn: False Claims Unit
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004

Attorney General Cynthia Coffman
Colorado Department of Law
Office of the Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203

Attorney General George Jepsen
Office of the Attorney General
55 Elm Street
Hartford, CT 06141-0120

U.S. Attorney's Office for the
    District of Columbia
555 4th Street, NW
Washington, DC  20530

Attorney General Matt Denn
Office of the Attorney General
820 North French Street
Wilmington, DE 19801

Attorney General Pam Bondi
The Capitol PL-01
Tallahassee, FL 32399-1050

Chief Financial Officer Jeff Atwater
200 East Gaines Street
Tallahassee, FL 32399

Honorable Sam Olens
Office of the Attorney General
40 Capitol Square, S.W.
Atlanta, GA 30334-1300

Attorney General David M. Louie
Office of the Attorney General
425 Queen Street
Honolulu, HI 96813

Attorney General Lisa Madigan
Office of the Attorney General
James R. Thompson Center
100 West Randolph Street
Chicago, IL 60601

Attorney General Greg Zoeller
Office of the Attorney General
Indiana Government Center South
Fifth Floor
302 West Washington Street
Indianapolis, IN 46204

Inspector General Cynthia Carrasco
Office of the Inspector General
315 West Ohio Street, Room 104
Indianapolis, Indiana 46202

Attorney General Tom Miller
Office of the Attorney General
Hoover State Office Building
1305 E. Walnut Street
Des Moines, IA 50319

Attorney General James Caldwell
Office of the Attorney General
Post Office Box 94005
Baton Rouge, LA 70804-4095

Attorney General Brian Frosh
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202-2202

Attorney General Maura Healey
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698

Attorney General Bill Schuette
G. Mennen Williams Building, 7th Floor
525 West Ottawa Street
Post Office Box 30212
Lansing, MI 48909-0212

Attorney General Lori Swanson
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN 5101

Attorney General Tim Fox
Office of the Attorney General
Justice Building, Third Floor
215 North Sanders
PO Box 201401
Helena, MT 59620-1401

Attorney General Adam Paul Laxalt
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701

Attorney General Joseph Foster
Office of the Attorney General
New Hampshire Department of Justice
Concord, NH 03301

Attorney General John Hoffman
Office of the Attorney General
Richard J. Hughes Justice Complex
25 Market Street
PO Box 080
Trenton, NJ 08625

Attorney General Hector Balderas
Office of the Attorney General
Post Office Drawer 1508
Santa Fe, NM 87504-1508

Attorney General Eric Schneiderman
Office of the Attorney General
Managing Clerk's Office
24th Floor
120 Broadway
New York, NY 10271

Attorney General Roy Cooper
Office of the Attorney General
9001 Mail Service Center
Raleigh, NC 27699-9001

Attorney General Scott Pruitt
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

Attorney General Peter Kilmartin
Office of the Attorney General
150 South Main Street
Providence, RI 02903

Attorney General Herbert Slatery, III
Office of the Attorney General and Reporter
PO Box 20207
Nashville, TN 37202-0207

Attorney General Ken Paxton
Capitol Station
PO Box 12548
Austin, TX 78711-2548

Attorney General Sean D. Reyes

Office of the Attorney General

350 North State Street Suite 230

Salt Lake City, UT84114-2320

Attorney General Mark Herring

Office of the Attorney General

900 East Main Street

Richmond, VA 23219

Attorney General Bob Ferguson

Office of the Attorney General

1125 Washington Street SE

PO Box 40100

Olympia, WA 98504-0100

District of Columbia

Attorney General Karl Racine

Office of the Attorney General

441 4th Street, NW

Washington, DC 20001

Tillman Finley